UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:

Racing Services, Inc.,                               Bankruptcy No. 04-30236
                                                     Chapter 7
            Debtor.
_____/

PW Enterprises, Inc., a Nevada corporation,

            Plaintiff,

       v.                                            Adv. No. 06-7020

State of North Dakota, a governmental entity;
North Dakota Racing Commission, a regulatory
agency; North Dakota Breeders' Fund, a special
fund; North Dakota Purse Fund, a special fund;
and North Dakota Promotions Fund, a special
fund,

            Defendants.

_____/

**MEMORANDUM AND ORDER**

On February 2, 2006, Plaintiff PW Enterprises, Inc. (PWE) filed a complaint initiating

the above-captioned adversary proceeding.  This case is presently before the Court on PWE's

motion for summary judgment filed on March 16, 2010.  Defendants State of North Dakota, a

governmental entity; North Dakota Racing Commission, a regulatory agency; North Dakota

Breeders' Fund, a special fund; North Dakota Purse Fund, a special fund; and North Dakota

Promotions Fund, a special fund (collectively, "the State") filed a cross motion for summary

1

judgment on April 15, 2010. The Court held a hearing on June 24, 2010. The following constitutes the Court's findings of fact and conclusions of law.

FINDINGS OF FACT

This case is about parimutuel horse racing in North Dakota. It involves the establishment and evolution of parimutuel horse racing statutes and regulations, as well as RSI's role in the horse racing industry as a simulcast service provider.

In 1987, the North Dakota Legislature legalized parimutuel horse racing under the certificate system by enacting N.D.C.C. § 53-06.2-10. At the time, a person betting on a horse race had to attend a live horse race in North Dakota. 1987 N.D. Sess. Laws, ch. 618, § 10. In addition, the legislature established the North Dakota Racing Commission ("the commission") as the administrative agency responsible for regulating racing under the certificate system with the authority to adopt administrative rules. 1987 N.D. Sess. Laws, ch. 618, §§ 2-5.

A taxing (or takeout) statute applicable to the new charitable horse racing legislation was also enacted in 1987 under N.D.C.C. § 53-06.2-11. This section established formulas for the amounts to be taken from the parimutuel wagering pool as revenue to the State, as payment to bettors holding winning tickets, and for use by the approved licensee for allowable expenses. See 1987 N.D. Sess. Laws, ch. 618, § 11.

At all times relevant to this proceeding, revenue derived from parimutuel racing was directed to the general fund under the control of the state treasurer, and to three special funds administered by the commission – the North Dakota Breeders' Fund, the North Dakota Purse Fund, and the North Dakota Promotion Fund. See N.D.C.C. § 53-06.2-11. The commission and each of the three special funds are Defendants in this case. The breeders' fund was established

2

to financially reward breeders or owners of North-Dakota bred horses with payment in accordance with rules approved by the commission. N.D.C.C. § 53-06.2-01(1). The purse fund was established to supplement and improve purses offered at racetracks within the state. N.D.C.C. § 53-06.2-01(10). The promotion fund was established to assist in improving and upgrading racetracks, promoting horse racing, and developing new racetracks as necessary and approved by the commission. N.D.C.C. § 53-06.2-01(12).

In 1989, the legislature enacted N.D.C.C. § 53-06.2-10.1, authorizing "off track" parimutuel wagering. See 1989 N.D. Sess. Laws, ch. 624, § 8. Under off track parimutuel wagering, bettors are permitted to wager on horse races both within and outside of North Dakota. See N.D.C.C. § 53-06.2-10.1.

In 1990, the commission adopted regulations for off track parimutuel wagering, also called "simulcasting" of horse races.[1] See N.D. Admin. Code § 69.5-01-11. The regulations make a distinction between a "simulcast operator" and a "simulcast service provider." The 1990 version of N.D. Admin. Code § 69.5-01-11-01 stated:

> 12. "Simulcast operator" means an eligible organization licensed by the commission to offer, sell, case, redeem, or exchange parimutuel tickets on races being simulcast from a sending track.
> 13. "Simulcast service provider" means a person engaged in providing simulcasting services to a simulcast operator and establishing, operating, and maintaining the combined parimutuel pool, but does not include persons authorized by the federal communications commission to provide telephone service or space segment time on satellite transponders.

RSI was a simulcast service provider, and the commission established the duties of a service provider. See N.D. Admin. Code § 69.5-01-11-04 (1990). This included the prohibition against

---

[1] In 1991, the legislature amended section 53-06.2-10.1, to reclassify "off track wagering" as "simulcast wagering" to make the statutory language consistent with commission regulations. See 1991 Sess. Laws, ch. 556, § 5; N.D.C.C. § 53-06.2-10.1.

a service provider also being a simulcast operator.  See N.D. Admin. Code § 69.5-01-11-04(3) (1990).  Section 69.5-01-11-06(5), N.D. Admin. Code (1990), also provided that the simulcast operator was responsible for the payment of the state takeout, the breeders' fund, and the purse fund provided by the commission.

On March 26, 1993, RSI submitted an Information Memorandum to the commission to obtain a 1993 service provider license.  The memorandum stated that Dakota Race Management (DRM) was holding the service provider license at the time, but that DRM had been restructured as RSI, with Susan Bala as RSI's sole shareholder.[2]  RSI proposed a system of collection and distribution of proceeds to be used for the simulcast system, including the distribution of taxes and statutory fees from the net proceeds.  The commission granted RSI's application for a simulcast service provider license.

RSI and Team Makers, Inc., a service operator, entered into a parimutuel wagering service agreement on January 1, 1994, whereby Team Makers was responsible for collecting the net proceeds including "all breeders' fund monies, purse fund monies, taxes, and all other monies retained from the gross parimutuel handle."  RSI, in turn, was responsible for performing an accounting of the net proceeds and for making the designated disbursements to the State.  The following year, on January 10, 1995, RSI and Team Makers entered into another service agreement, whereby RSI would pay "[a]ll designated disbursements to authorized regulatory agencies."

---

[2] DRM and the North Dakota Thoroughbred Association submitted an application to the commission for a license to be a simulcast service provider on November 30, 1989. The application stated that Bala was on DRM's management committee, and DRM would operate and manage the off track parimutuel betting system.  This included a system of accounting, collection, and disbursements of statutory fees to the State, the breeders' fund, and the purse fund.  The commission licensed DRM to be the service provider for the simulcast system through 1993.

4

At its June 14, 1995, meeting, the commission adopted N.D.A.C. § 69.5-01-11-04.1, as an "interim emergency rule." Section 69.5-01-11-04.1 designated the service provider, i.e., RSI, as the entity responsible for payment of "all pari-mutuel taxes, special fund contributions, and other funds due and owing the State of North Dakota as indicated in the certified report of its operations, required in this chapter, directly to the Racing Commission." N.D. Admin. Code § 69.5-01-11-04.1(1). This interim rule shifted the duty of paying the taxes and other contributions from the simulcast operator, Team Makers, to the service provider, RSI, to conform with RSI's established practice.

In 2001, the North Dakota Legislature amended N.D.C.C. § 53-06.2-10.1 to authorize a new form of parimutuel wagering in North Dakota called "account wagering." The new language added to section 53-06.2-10.1 provided:

> The certificate system also permits parimutuel wagering to be conducted through account wagering. As used in this section, "account wagering" means a form of parimutuel wagering in which an individual deposits money in an account and uses the account balance to pay for parimutuel wagers. An account wager made on an account established in this state may only be made through the licensed simulcast service provider authorized by the commission to operate the simulcast parimutuel wagering system under the certificate system. An account wager may be made in person, by direct telephone communication, or through other electronic communication in accordance with rules adopted by the commission.

See 2001 N.D. Sess. Laws, Ch. 466, § 1; N.D.C.C. § 53-06.2-10.1 (2001). The 2001 legislature also amended N.D.C.C. § 53-06.2-11, the statute authorizing the State to collect taxes on parimutuel wagering, but did not expressly make it applicable to account wagering. In other words, despite the new legislation authorizing account wagering, the 1995 version of the takeout statute, section 53-06.2-11, was not modified, and provided:

> 1. For each day of a live race meet or a simulcast day in this state on win, place and show pari-mutuel pools, the licensee shall deduct up to twenty percent of the total win, place and show pool. The licensee may retain seventeen percent for expenses. One-half of one percent must be paid to the North Dakota racing

5

>commission to be used for the North Dakota purse fund. One-half of one percent must be paid to the North Dakota racing commission to be used for the North Dakota breeders' fund for the respective breed of horses racing at that meet. The remaining two percent must be paid to the state treasurer to be deposited in the general fund.
>
>2. For each day of a live race meet or a simulcast day in this state for each daily double, quinella, exacta, trifecta, or other wager combining two or more horses for winning payoffs, the licensee shall deduct up to twenty-five percent of each wagering pool. Of this amount, the licensee may retain twenty-one percent for expenses. One-half of one percent must be paid to the commission to be deposited in the purse fund. One-half of one percent must be paid to the commission to be deposited in the promotion fund. One-half of one percent must be paid to the commission to be deposited in the breeders' fund. The remaining two and one-half percent must be paid to the state treasurer to be deposited in the general fund.

1995 N.D. Sess. Laws, ch. 487, § 1.

Further, no changes were made to the commission regulations to address the new account wagering provisions until 2007. Although the legislature made adjustments to the taxing statute formulas in 2003 and 2005, it did not amend the taxing statute to create a new category for account wagering take-out until 2007, as discussed further below. See 2007 N.D. Sess. Laws, ch. 448, § 7, ch. 449, § 2.

RSI submitted service provider license renewal applications to the commission in 2000, 2001, 2002, and 2003. The applications each specified:

>DISTRIBUTION: The SPECTRUM totalisator system provides a full accounting and audit trials of all monies generated by the Handle in the North Dakota Simulcast System. All parimutuel Handle and revenues are audited internally from the tote system generated reports. Verification is made of all parimutuel proceeds from the parimutuel deposits. Distribution is made by the Racing Services' accounting office. A weekly report is made for each site and for the statutory fees to the State of North Dakota, the Breeders Fund, the Purse Fund and the Promotion Fund. This report is audited weekly by the North Dakota racing steward and the funds disbursed to the State in accordance with state statute and regulations.[3]

---

[3] The only difference in the language among the applications is that in 2002 and 2003,

6

RSI's applications also stated that RSI had two irrevocable standby letters of credit in the total amount of $500,000[4] naming the State as the loss payee.

By mid-2003, the director of racing for the commission had made repeated demands to RSI for delinquent payments. RSI submitted the following payments to the commission:

| Check date | Amount |
|---|---|
| August 14, 2003 | $186,653.87 |
| August 14, 2003 | $439,074.85 |
| August 14, 2003 | $174,271.28 |
| August 14, 2003 | $134,687.98 |
| August 14, 2003 | $380,656.51 |
| August 14, 2003 | $166,845.15 |
| August 19, 2003 | $254,629.34 |
|  | $1,736,818.98 |

On August 20, 2003, North Dakota Attorney General Wayne Stenehjem addressed the commission. He stated that RSI was under investigation by both his office and the United States Attorney's Office, but that several considerations led him to recommend that the commission not take immediate action on RSI's license.

At its December 22, 2003 meeting, the commission reviewed RSI's renewal application to be the licensed service provider for 2004. The commission denied the license renewal and authorized its legal counsel to proceed against the $450,000 bond RSI obtained with the commission as the payee. On December 23, 2003, the commission made a draw on the irrevokable standby letter of credit, stating that RSI had not fulfilled its obligations under state law and commission rules and amounts owed were due and payable.

---

RSI hyphenated parimutuel ("pari-mutuel").

[4] One letter of credit was in the amount of $450,000 and the other was $50,000.

In 2007, the legislature amended N.D.C.C. § 53-06.2-1 to provide different formulas for the take-outs for "wagering on live horse racing and simulcast wagering" and "account wagering." See N.D.C.C. § 53-06.2-11(1) and (2). Randy Blaseg, the director of racing for the commission, testified about the intent behind the changes:

> This legislation will give incentive to high volume players to operate in North Dakota. This bill keeps in place the higher tax rates for all walk-up handle. The incentive goes only to those players using account wagering and targets the high volume players. These high volume players are very price sensitive and the only way for them to make a profit is through high volume. Much the same as other high volume low margin industries. This legislation provides incentives and allows for long-term planning by high volume players.

Hearing on H.B. 1126 Before the House Judiciary Comm., 60th N.D. Legis. Sess. (Jan. 10, 2007) (written testimony of Randy Blaseg, Director of Racing for the North Dakota Racing Commission). He reiterated the point later in his testimony:

> I cannot emphasize enough that the traditional walk up handle and any additional walk up handle will be at the higher rates. The reduced rates only come into play after 11 million dollars has been reached and only applies to account wagering. . . . [B]ecause of the national competition, the high volume players will only stay if these incentives . . . are in place.

Id.

RSI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 3, 2004. The case was converted to a case under Chapter 7 on June 15, 2004. The State submitted a proof of claim for taxes incurred by RSI between October 2002 and August 2003 in the amount of $6,726,872.72. PWE submitted a proof of claim for money loaned, wagering winnings and deposits in the amount of $2,248,100.86. PWE is RSI's largest non-governmental creditor.

PWE filed its complaint in this adversary proceeding on February 2, 2006, and on November 5, 2008, the Court granted PWE derivative standing to pursue its avoidance action

8

claims against the State. Presently before the Court are PWE's motion for summary judgment and the State's cross motion for summary judgment.

## CONCLUSIONS OF LAW

Rule 56 of the Federal Rules of Civil Procedure governs the granting of summary judgment motions and is made applicable to bankruptcy proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Summary judgment is appropriate if, "assuming all reasonable inferences favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane), 124 F.3d 978, 981-82 (8th Cir. 1997) (citations omitted). Procedurally, the initial burden is on the moving party to establish the lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Dennis v. Novotny (In re Novotny), 224 B.R. 917, 921 (Bankr. D.N.D. 1998). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party to set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson, 477 U.S. at 248). A party resisting

summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour & Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993). However, summary judgment will not be granted in the moving party's favor "unless the moving party has established the right to a judgment with such clarity as to leave no room for controversy.'" Simundson v. United Coastal Ins. Co., 951 F. Supp. 165, 166-67 (D.N.D. 1997) (quotation omitted).

I.   Declaratory Relief

PWE's first claim for relief is that the State's claim for unpaid taxes should be disallowed because the basis for the claim is unenforceable under North Dakota law.

   A.   Did North Dakota law impose a tax on RSI's account wagering activities?

The North Dakota Constitution provides, in relevant part: "No tax shall be levied except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." N.D. Const. art. X, § 3; see also American Crystal Sugar Co. v. Traill Cnty. Bd. of Comm'rs, 2006 ND 118, ¶ 5 (stating that taxation of property is a legislative function).

There is no dispute that the amounts collected and claimed by the State constitute taxes.[5] The State's proof of claim states that the basis for the claim is "Taxes" and relies on the amounts

---

[5] PWE's second claim for relief in its complaint seeks a determination that the State's claim is not entitled to priority status because the taxes allegedly owed by RSI to the State are not taxes, but rather are fees or assessments. In its motion for summary judgment, however, PWE abandoned this claim and conceded that the amounts collected and claimed by the State constitute taxes. Accordingly, there is no genuine issue of material fact and the State is entitled to judgment as a matter of law as to PWE's second claim for relief.

claimed being taxes to support its asserted priority claim. Therefore, as taxes, the State's claim must be supported by a valid taxing authority. See N.D. Const. art. X, § 3.

PWE argues that no tax on account wagering was authorized under North Dakota law prior to the 2007 amendments to N.D.C.C. § 53-06.2-11, which specifically authorized a tax on account wagering. The State concedes that there was not specific statutory authority for the tax on account wagering prior to the 2007 amendments to N.D.C.C. § 53-06.2-11. It argues the Court should construe the authority to levy and collect the tax, despite the lack of direct legislative authority, because account wagering without taxation for a charitable purpose would be unconstitutional.

> Indeed, the North Dakota Constitution provides:
>
> The legislative assembly shall not authorize any game of chance, lottery, or gift enterprises, under any pretense, or for any purpose whatever. However, the legislative assembly shall authorize the state of North Dakota to join a multi-state lottery for the benefit of the state of North Dakota, and, the legislative assembly may authorize by law bona fide nonprofit veterans', charitable, educational, religious, or fraternal organizations, civic and service clubs, or such other public-spirited organizations as it may recognize, to conduct games of chance when the entire net proceeds of such games of chance are to be devoted to educational, charitable, patriotic, fraternal, religious, or other public-spirited uses.

N.D. Const., art. XI, § 25.

The Court disagrees with the State's concession that N.D.C.C. § 53-06.2-11 did not provide direct legislative authority to levy and collect the tax on account wagering prior to the 2007 amendments. When the legislature amended N.D.C.C. § 53-06.2-10.1 to authorize account wagering in 2001, it characterized account wagering as a form of simulcast parimutel wagering. Although the 2002-2003 version of N.D.C.C. § 53-06.2-11 did not expressly reference account wagering activity, it did apply to simulcast wagering. By virtue of N.D.C.C. § 53-06.2-10.1,

11

account wagering was simulcast wagering, and the tax for simulcast wagering was authorized under N.D.C.C. § 53-06.2-11.

Even if N.D.C.C. § 53-06.2-11 were ambiguous as to whether it applied to account wagering, application of the rules of statutory construction similarly lead to the conclusion that it did apply to account wagering. The North Dakota Supreme Court summarized the rules of statutory construction in In re M.W., 2009 ND 55, ¶ 6, 764 N.W.2d 185:

> Our primary goal in statutory construction is to ascertain the intent of the legislature, and we first look to the plain language of the statute and give each word of the statute its ordinary meaning. When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit. If, however, the statute is ambiguous or if adherence to the strict letter of the statute would lead to an absurd or ludicrous result, a court may resort to extrinsic aids, such as legislative history, to interpret the statute. A statute is ambiguous if it is susceptible to meanings that are different, but rational. We presume the legislature did not intend an absurd or ludicrous result or unjust consequences, and we construe statutes in a practical manner, giving consideration to the context of the statutes and the purpose for which they were enacted.

(quoting State v. Fasteen, 2007 ND 162, ¶ 8, 740 N.W.2d 60 (citations omitted)). PWE argues that "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer," but PWE oversimplifies this maxim. It does not mean that any ambiguous tax statute must be strictly construed against the State. Amerada Hess Corp. v. North Dakota, 2005 ND 155, ¶ 19, 704 N.W.2d 8. Instead, the rule of strict construction of ambiguous tax statutes in favor of the taxpayer is a rule of last resort when other means of ascertaining the legislature's intent have failed. Id. at ¶ 20. Had the legislature not intended for account wagering to be subject to taxation under N.D.C.C. § 53-06.2-11, the activity authorized by the legislature in N.D.C.C. § 53-06.2-10.1 would have been in contravention of the prohibition against games of chance without a charitable purpose as delineated in the North Dakota

12

Constitution. See N.D. Const., art. XI, § 25. Consistent with the rules of statutory construction, the Court presumes the legislature did not intend this absurd result. See In re M.W., at ¶ 6.

PWE further argues that the 2007 amendments to N.D.C.C. § 53-06.2-11 demonstrate that there was no authority to tax account wagering prior to the amendments, citing the testimony of Randy Blaseg, the director of racing for the commission. The Court, however, concludes that his testimony supports the opposite conclusion. Blaseg testified that the purpose of the amendments was to provide a reduced tax rate for high volume players to encourage them to continue betting in North Dakota. In other words, high-volume players had been subject to the take-out formulas established for live race and simulcast wagering generally, but the amendments carved out lower take-out formulas specifically for high-volume account wagering as an incentive.

For these reasons, the Court concludes that during the times relevant to this case, N.D.C.C. § 53-06.2-11 authorized taxation on account wagering.

B.     Did North Dakota law authorize a tax on simulcast providers like RSI?

During the relevant time period, 2002-2003, N.D.A.C. § 69.5-01-11-06(5) made the simulcast operator responsible for the payment of all statutory fees to the State. It was not until 2007 that the North Dakota Administrative Code designated the simulcast service provider, i.e., RSI, responsible for the payment of parimutuel taxes and other fees due the State. See N.D. Admin. Code § 69.5-01-11-04(13)(a).

The commission licensed DRM to operate as the service provider for the simulcast system from 1989 to 1993, during which time DRM collected and disbursed the taxes and fees. In 1993, RSI informed the commission that DRM had been restructured as RSI, and it sought to obtain a service provider license. RSI proposed a system of collection and distribution of

proceeds to be used for the simulcast system, including the distribution of taxes and statutory fees from the net proceeds. The commission granted RSI's application for a simulcast service provider license.

RSI and Team Makers entered into a parimutuel wagering service agreement on January 1, 1994, whereby Team Makers was responsible for collecting the net proceeds including "all breeders' fund monies, purse fund monies, taxes, and all other monies retained from the gross parimutuel handle." RSI, in turn, was responsible for performing an accounting of the net proceeds and for making the designated disbursements to the State. The following year, on January 10, 1995, RSI and Team Makers entered into another service agreement, whereby RSI would pay "[a]ll designated disbursements to authorized regulatory agencies."

At its June 14, 1995, meeting, the commission adopted N.D.A.C. § 69.5-01-11-04.1, as an "interim emergency rule."[6] Section 69.5-01-11-04.1 designated the service provider, i.e., RSI, as the entity responsible for payment of "all pari-mutuel taxes, special fund contributions, and other funds due and owing the State of North Dakota as indicated in the certified report of its operations, required in this chapter, directly to the Racing Commission." N.D. Admin. Code § 69.5-01-11-04.1(1). This interim rule shifted the duty of paying the taxes and other contributions from the simulcast operator to the service provider to conform with RSI's established practice.

PWE argues that under N.D.C.C. § 28-32-03(6), the commission's interim emergency rule became ineffective in December 1995 because the commission did not adopt it as a final

---

[6] Section 28-32-03, N.D.C.C., provides that agencies may adopt "emergency rules." Section 28-32-03 applies to the commission because N.D.C.C. § 28-32-01(2) defines "agency" in relevant part as "each board, bureau, commission, department, or other administrative unit of the executive branch of state government[.]"

14

rule. See N.D.C.C. § 28-32-03(6) (an interim final rule becomes ineffective 180 days after its declared effective date unless it is first adopted as a final rule). PWE is correct that after the interim emergency rule lapsed, the responsibility to pay the taxes and fees shifted back to the simulcast operator. Notwithstanding, the Court finds no statutory or regulatory prohibition against RSI paying the taxes and fees instead of the simulcast operator. In other words, RSI's continued practice of handling this responsibility on behalf of the simulcast operator was not in contravention of the law.

Accordingly, there is no genuine issue as to any material fact and the State is entitled to judgment as a matter of law with respect to PWE's first claim for relief.

II.     Preferential and/or Fraudulent Transfers

PWE's third and fourth claims for relief allege that the State received preferential transfers that should be avoided 11 U.S.C. § 547. For PWE to prevail on these claims, it must prove, by a preponderance of the evidence, the following elements:

1. a transfer of an interest of the debtor in property;
2. on account of an antecedent debt;
3. to or for the benefit of a creditor;
4. made while the debtor was insolvent;
5. within 90 days prior to the commencement of the bankruptcy case;[7]
6. that left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a Chapter 7 liquidation..

11 U.S.C. § 547(b); Wells Fargo Home Mortgage, Inc. v. Lindquist, 592 F.3d 838, 842 (8th Cir. 2010).

PWE first argues that RSI's transfer of $450,000 to the State within 90 days of the petition date constitutes a preferential transfer, and that RSI's transfer of $1,736,282.14 to the

---

[7] The preference period for insiders is within one year prior to the commencement of the bankruptcy case. 11 U.S.C. § 547(b)(4)(B).

State within one year of the petition date constitutes a preferential transfer to an insider. Genuine issues of material fact remain as to PWE's claims under section 547, particularly with regard to the first element, whether there was a transfer of an interest of the debtor in property. For this reason, summary judgment in favor of either party is inappropriate. These claims will proceed to trial for determination.

PWE also seeks avoidance and recovery of the transfers as fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B)and 544(b)(1) and N.D.C.C. §§ 13-02.1-04 and 13-02.1-07. PWE argues, among other things, that because RSI was not responsible for the payment of the assessments to the State, RSI received less than reasonably equivalent value in exchange for the transfers.

Again, genuine issues of material fact exist as to these claims, and summary judgment in favor of either party is denied.[8]

III.    Equitable Subordination

A bankruptcy court may subordinate an allowed administrative claim to other claims under principles of equitable subordination. Kaler v. Bala (In re Racing Services, Inc.), 571 F.3d 729, 731 (8th Cir. 2009). Equitable subordination requires proof of inequitable conduct by the claimant that injured other creditors or conferred an unfair advantage. Id. Fraud, illegality, and breach of fiduciary duty are misconduct that justifies equitable subordination. Id.

PWE argues that the State's claim should be equitably subordinated because RSI's creditors relied on the State to protect their interests and the integrity of North Dakota's racing industry. It further argues that the State knew RSI was having financial difficulty yet permitted

---

[8] PWE's eighth claim for relief asserts that to the extent that any transfers are avoidable – either as preferential or fraudulent – that the estate is entitled to recover the transfers under 11 U.S.C. § 550(a). This claim is dependant upon the outcome of the preferential and fraudulent transfer claims and will likewise proceed to trial.

it to fall deeper into insolvency and that RSI was allowed to retain its license despite the State's knowledge that RSI was conducting an illegal gambling operation. In short, PWE argues the State failed to competently and effectively regulate RSI.

Genuine issues of material fact remain as to this claim, and summary judgment in favor of either party is denied.

For the foregoing reasons, summary judgment is GRANTED in favor of the State with respect to PWE's first claim for relief. Summary judgment in favor of either party is DENIED in all other respects. The case will proceed to trial on PWE's remaining claims.

The Court has considered all other arguments and deems them to be without merit.

**SO ORDERED.**

**JUDGMENT ON PARTIAL FINDINGS SHALL BE ENTERED ACCORDINGLY.**

Dated this December 22, 2010.

                    **WILLIAM A. HILL, JUDGE**
                    **U.S. BANKRUPTCY COURT**