## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

In re:                                              Bankruptcy No. 04-30236
                                                    Chapter 7
Racing Services, Inc.,

                    Debtor.
_____/

PW Enterprises, Inc, a Nevada
corporation,

                    Plaintiff,

            vs.                                     Adversary No. 06-7020

State of North Dakota, a governmental
entity; North Dakota Racing Commission,
a regulatory agency; North Dakota
Breeders Fund, a special fund; North
Dakota Purse Fund, a special fund; North
Dakota Promotions Fund, a special
fund,

                    Defendants.
_____/

### MEMORANDUM AND ORDER

PW Enterprises, Inc. (PWE), an unsecured creditor of Debtor, Racing

Services, Inc. (RSI), filed this adversary proceeding on February 2, 2006.  PWE

asserted various claims for relief, including disallowance of the State's claim for

unpaid taxes, denial of priority status for the State's claim, equitable subordination

of the State's claim, and the avoidance and recovery of allegedly preferential and fraudulent transfers from RSI to the State. The Bankruptcy Court[1] sustained the State's Motion to Dismiss finding that PWE lacked standing to pursue its complaint and struck it from the record on August 7, 2006. After appeals to the Eighth Circuit Bankruptcy Appellate Panel (BAP) and the Eighth Circuit Court of Appeals, the bankruptcy court vacated its order striking the complaint on September 29, 2008, and granted PWE derivative standing to pursue its claims on November 5, 2008. The State filed an Answer on January 9, 2009, denying the allegations.

PWE filed a Motion for Summary Judgment on March 16, 2010, and the State filed a Cross Motion for Summary Judgment on April 15, 2010. The court granted summary judgment in favor of the State on PWE's claim seeking disallowance of the State's claim for unpaid taxes and denied summary judgment in all other respects. Both parties sought leave to appeal, and the BAP denied both requests. The case was tried December 12th through December 14th, 2011. It was extremely well-presented.

FINDINGS OF FACT

---

[1] The Honorable William A. Hill, presiding.

This case involves parimutuel wagering on horse races. Parimutuel wagering is a form of wagering in which bettors wager against other bettors and not against the "house." RSI was a simulcast service provider in North Dakota. PWE was a high-volume bettor with accounts placed with RSI.

A.   <u>Parimutuel Horse Racing in North Dakota</u>

In 1987, the North Dakota Legislature authorized parimutuel horse racing under N.D.C.C. § 53-06.2-10. At the time, the Legislature only authorized betting while attending a live race in North Dakota under the "certificate system":

> The certificate system allows a licensee to receive money from any person present at a race who desires to bet on any horse entered in that race. A person betting on a horse to win acquires an interest in the total money bet on all horses in the race, in proportion to the amount of money bet by that person, under rules adopted by the commission. The licensee shall receive such bets and for each bet shall issue a certificate to the bettor on which is at least shown the number of the race, the amount bet, and the number or name of the horse selected by the bettor. The commission may also adopt rules for place, show, quinella, combination, or other types of betting usually connected with racing.

1987 N.D. Sess. Laws, ch. 618, § 10. The Legislature also established the North Dakota Racing Commission as the administrative agency responsible for regulating racing under the certificate system and gave it authority to adopt administrative rules. 1987 N.D. Sess. Laws, ch. 618, §§ 2–5.

The Legislature also enacted a statute, N.D.C.C. § 53-06.2-11, to establish

3

"takeouts" to be deducted from the parimutuel wagering pool for payments as revenue to the State, payments to bettors holding winning tickets, and use by the approved licensee for allowable expenses.  1987 N.D. Sess. Laws, ch. 618, § 11.

Revenue derived from parimutuel racing was directed to the general fund under the control of the State Treasurer, and to three special funds administered by the Racing Commission—North Dakota Breeders' Fund, North Dakota Purse Fund, and North Dakota Promotion Fund.  See N.D.C.C. § 53-06.2-11.  The Racing Commission and the three special funds are Defendants in this case.  The Breeders' Fund was established to financially reward breeders or owners of North Dakota-bred horses with payment in accordance with rules approved by the Racing Commission.  N.D.C.C. § 53-06.2-01(1).  The Purse Fund was established to supplement and improve purses offered at racetracks within the state.  N.D.C.C. § 53-06.2-01(10).  The Promotion Fund was established to assist in improving and upgrading racetracks, promoting horse racing, and developing new racetracks as necessary and approved by the Racing Commission.  N.D.C.C. § 53-06.2-01(12).

1.    Off-Track Wagering and Simulcasting

In 1989, the Legislature enacted N.D.C.C. § 53-06.2-10.1, authorizing "off track" parimutuel wagering.  See 1989 N.D. Sess. Laws, ch. 624, § 8.  Off track

parimutuel wagering allows bettors to wager on horse races both within and

outside of North Dakota.  Specifically, the legislation provided:

> In addition to racing under the certificate system, as authorized by this chapter, and conducted upon the premises of a race track, off track parimutuel wagering may be conducted in accordance with the chapter and interim standards that need not comply with chapter 28-32, or rules adopted by the commission under this chapter.  Any organization qualified under section 53-06.2-06 to conduct racing may make written application to the commission for the conduct of off track parimutuel wagering on races held at licensed race courses inside the state or race courses outside the state, or both.

1989 N.D. Sess. Laws, ch. 624, § 8; N.D.C.C. § 53-06.2-10.1.

In 1990, the Racing Commission adopted regulations for off track

parimutuel wagering, also called "simulcasting," of horse races.[2]  See N.D. Admin.

Code § 69.5-01-11.  The regulations distinguished "simulcast operator" from

"simulcast service provider":

> 12.   "Simulcast operator" means an eligible organization licensed by the commission to offer, sell, case, redeem, or exchange parimutuel tickets on races being simulcast from a sending track.

> 13.   "Simulcast service provider" means a person engaged in providing simulcasting services to a simulcast operator and establishing, operating, and maintaining the combined parimutuel pool, but does not include persons authorized by the

---

[2] In 1991, the Legislature amended N.D.C.C. § 53-06.2-10.1, to reclassify "off track wagering" as "simulcast wagering" to make the statutory language consistent with Racing Commission regulations.  See 1991 N.D. Sess. Laws, ch. 556, § 5; N.D.C.C. § 53-06.2-10.1.

5

> federal communications commission to provide telephone service or space segment time on satellite transponders.

N.D. Admin. Code § 69.5-01-11-01 (1990).

RSI—the debtor in this case—was a simulcast service provider. Team Makers was a simulcast operator. All simulcast service providers and simulcast operators were required to be licensed by the Racing Commission. N.D. Admin. Code § 69.5-01-11-02(1). Before the Racing Commission could license a simulcast service provider (like RSI), it was required to review and approve the services to be provided by the applicant, including:

> g.  Written agreements between the applicant and all parties assisting in providing simulcast services.
> . . . .
> i.  The system of accounts to be utilized in the collection and distribution of revenues directly or indirectly related to the simulcast operation and the combined parimutuel pool.

N.D. Admin. Code § 69.5-01-11-03(2). Similarly, before the Racing Commission could license a simulcast operator (like Team Makers), it was required to review and approve a plan of operation submitted by the applicant, including:

> d.  The system of accounts to maintain a separate record of revenues collected by the simulcast facility, the distribution of such revenues, and the accounting of costs relative to the simulcast operation.
> . . . .
> f.  All written agreements or letters of consent between parties to the operation of the simulcast system, including a licensed service provider.

6

N.D. Admin. Code § 69.5-01-11-05(1).  Simulcast operator and simulcast service

providers licensees were subject to denial, suspension, or revocation of simulcast

licenses for just cause, including the "[c]ontinued failure or inability to meet

financial obligations connected with the operation of any part of a simulcast

system or simulcast site."  N.D. Admin. Code § 69.5-01-11-09(g).

The Racing Commission established the duties and restrictions of simulcast

service providers and simulcast operators.  See N.D. Admin. Code §§ 69.5-01-11-

04 and 69.5-01-11-06.  A simulcast service provider (RSI) was prohibited from

being a simulcast operator (Team Makers).  N.D. Admin. Code § 69.5-01-11-

04(3).  The simulcast operator (Team Makers) was responsible for the payment of

the state takeout, the Breeders' Fund, and the Purse Fund provided by the Racing

Commission.  N.D. Admin. Code § 69.5-01-11-06(5).

2.    Account Wagering

In 2001, the North Dakota Legislature authorized a new form of parimutuel

wagering—"account wagering"—through amendment to N.D.C.C. § 53-06.2-10.1.

Section 53-06.2-10.1 provides, in relevant part:

> The certificate system also permits parimutuel wagering to be
> conducted through account wagering.  As used in this section,
> "account wagering" means a form of parimutuel wagering in which an
> individual deposits money in an account and uses the account balance
> to pay for parimutuel wagers.  An account wager made on an account

established in this state may only be made through the licensed
simulcast service provider approved by the attorney general and
authorized by the commission to operate the simulcast parimutuel
wagering system under the certificate system.  The attorney general
may not grant a license denied by the commission.  An account wager
may be made in person, by direct telephone communication, or
through other electronic communication in accordance with rules
adopted by the commission.

N.D.C.C. § 53-06.2-10.1.

B.    Factual Background and Findings of Fact on This Particular Dispute

       1.    RSI – Team Makers Relationship

       As stated, RSI was a simulcast service provider and Team Makers was a

simulcast operator.  In the Ruling on the State's Motion for Summary Judgment

dated December 22, 2010, Judge Hill explained the relationship between RSI and

Team Makers:

              RSI and Team Makers entered into a parimutuel wagering
       service agreement on January 1, 1994, whereby Team Makers was
       responsible for collecting the net proceeds including "all breeders'
       fund monies, purse fund monies, taxes, and all other monies retained
       from the gross parimutuel handle."  RSI, in turn, was responsible for
       performing an accounting of the net proceeds and for making the
       designated disbursements to the State.  The following year, on January
       10, 1995, RSI and Team Makers entered into another service
       agreement, whereby RSI would pay "[a]ll designated disbursements to
       authorized regulatory agencies."

              At its June 14, 1995, meeting, the commission adopted
       N.D.A.C. § 69.5-01-11-04.1, as an "interim emergency rule."  Section
       69.5–01–11–04.1 designated the service provider, i.e., RSI, as the
       entity responsible for payment of "all pari-mutuel taxes, special fund

8

contributions, and other funds due and owing the State of North
Dakota as indicated in the certified report of its operations, required in
this chapter, directly to the Racing Commission." N.D. Admin. Code
§ 69.5-01-11-04.1(1). This interim rule shifted the duty of paying the
taxes and other contributions from the simulcast operator to the
service provider to conform with RSI's established practice.

PW Enterprises, Inc. v. State of North Dakota (In re Racing Services, Inc.), 2010

WL 5376222, at *8 (Bankr. D.N.D. December 22, 2010). The interim emergency

rule lapsed, and the legal responsibility to pay the taxes and fees shifted back to

Team Makers. Id. However, this Court previously found there was "no statutory

or regulatory prohibition against RSI paying the taxes and fees instead of the

simulcast operator (Team Makers). In other words, RSI's continued practice of

handling this responsibility on behalf of the simulcast operator (Team Makers) was

not in contravention of the law." Id.

Under a July 17, 2000 agreement between RSI and Team Makers, RSI was

responsible for making the "designated disbursements to authorized regulatory

agencies." The contract actually began on January 1, 2000, and continued for a

two-year term. The contract automatically renewed for a like term on its

anniversary date.

RSI and Team Makers were both licensed by the State and had to submit

annual license renewal applications. RSI's renewal applications stated that RSI

was responsible for making the "designated disbursements to authorized regulatory

9

agencies." Team Makers' applications similarly stated that RSI would "make the necessary distributions for simulcast operations."

    2.      PWE and Parimutuel Wagering in North Dakota

William Wass is the chief operating officer of PWE. He testified that PWE began its parimutuel wagering operations in North Dakota in 1999. PWE, through its chief executive officer, Peter Wagner, entered into an agreement with RSI under which PWE was to receive certain incentives based on its projected high volume of wagering handle.[3] This proved to be true.

During the first half of 2003, for example, PWE had at least three employees in North Dakota, and PWE leased space for its employees from RSI. PWE wagered on a daily basis. Although the average bet was under $50.00, PWE wagered $70 million in the first seven months of 2003. PWE had developed proprietary software for the purpose of wagering on horse races in the United States and Canada. Wass described the relationship between RSI and PWE as a customer-vendor relationship. PWE used the services of RSI as a licensed service provider in North Dakota for the purpose of placing wagers.

Wass testified that Susan Bala, RSI's president and chief executive officer, asked Wagner to pledge a $225,000 certificate of deposit as security so that RSI

---

[3] The "Handle" is the total amount of bets placed for a particular period of time.

could obtain a $450,000 letter of credit.  On October 1, 1999, PWE's executive

director at the time, Tonye-Marie Castaneda, signed a Third Party Pledge

Agreement with Norwest Bank for a $225,000 certificate of deposit.

Bala and Wagner also had a relationship outside of that of PWE and RSI.  In

March 2001, Bala and Wagner formed a partnership, SBE, LLC, with the goal of

purchasing a gaming company in Mexico with a race track and other real estate.

Also, Wass is the Secretary and Treasurer of SBE.  The partnership still exists but

is not operating. SBE currently has approximately $800,000 in an account from the

sale of real estate.  Bala was removed from the management of SBE in July 2003

for reasons discussed further below.  Bala's only role in SBE now is as a 15%

shareholder.

3.      RSI and the Racing Commission

Paul Bowlinger became the director of the Racing Commission in

September 2000.  As director, Bowlinger oversaw the regulation of all aspects of

horse racing in North Dakota.  This included, among other tasks, implementing the

applicable North Dakota Administrative Code sections, complying with Racing

Commission rules, ensuring that tellers and parlors were licenced, and ensuring

that RSI provided weekly handle reports to see that funds were appropriately

collected.  Bowlinger considered himself an advocate for the players.  He is a

11

former player with a love of horse racing generally, and of handicapping specifically.

Bowlinger testified that the Racing Commission had audit oversight of RSI. RSI submitted weekly statements and an independent contractor, Roger Thompson, audited the weekly reports and reported to the Racing Commission.  At the end of each month, Bowlinger made sure the correct amounts were collected.  The North Dakota Auditor's Office audited the Racing Commission every two years.

On September 14, 2001, Arleen McKay, RSI's controller, sent a letter to Bowlinger and the members of the Racing Commission.  The letter explained that as a consequence of the events of 9/11, a majority of racetracks had been closed. The letter noted this affected all aspects of wagering operations and reconciliations.  RSI asked for a 30-day extension for the parimutuel and special funds payments and a waiver of interest and penalties.

The Racing Commission met on October 17, 2001, and considered RSI's request.  At the meeting, Bala stated that many of the racetracks were still closed which resulted in the interruption of all business operations.  RSI had receivables of half a million dollars, but reconciliations had become slow.  When asked whether payments would be late for the foreseeable future, Bala informed the Racing Commission that it would be hard to predict but she would keep them

informed.  The Racing Commission voted unanimously to waive all penalties and

interest due for the amounts RSI owed the State and the Racing Commission for

the August payment, which was due by September 30, 2001.  The Racing

Commission announced this issue would be considered on a month-to-month basis

if necessary.

Bowlinger testified that RSI continued to be delinquent by two to three

months on the special fund payments until 2003, but the Racing Commission

approved of RSI paying these fund payments late.  Bowlinger brought the issue up

to the Racing Commission "every so often," and the Racing Commission kept

allowing extensions.  The Racing Commission believed that as long as RSI was

fairly current, there was not a problem. Further, no complaints were lodged against

RSI.  The Racing Commission did not want to take the business down as long as

RSI kept making its payments.

Bowlinger testified he had suspicions about RSI in January 2003.  In

performing his auditing functions, Bowlinger received information from at least

one racetrack that it was reporting a handle from North Dakota that was greater

than what RSI reported to the Racing Commission.  He did not say what he did, if

anything, based on these suspicions.

Bowlinger received a call from an RSI employee, Michael Cichy, and his

attorney in April 2003.  Cichy wanted to talk to Bowlinger immediately about

improprieties at RSI.  Bowlinger organized a telephonic meeting for the following

day with Cichy, Bowlinger, and the Racing Commission's counsel.  Cichy said that

RSI was operating an unlicensed wagering site.  As a consequence of that meeting,

Bowlinger called the Attorney General's office.  The following morning, the

Attorney General and representatives from the Federal Bureau of Investigation,

Internal Revenue Service, and Department of Justice were in Bowlinger's office.

###### 4.      RSI's Mounting Troubles and PWE Stops Wagering

The FBI eventually raided the RSI site.[4]  At that point, Bowlinger was

directed by the United States Attorney and the North Dakota Attorney General to

refer any communications to the Attorney General's Office.

On June 5, 2003, RSI sent the Racing Commission amended handle reports

to account for the wagering from the unlicensed "stealth" site.  On July 18, 2003,

Bowlinger sent Bala a letter stating that RSI was current on general fund payments

but delinquent on the three special fund payments.  The letter told her he was

advising the Racing Commission to take action on RSI's license unless the issue of

nonpayment was addressed immediately.  Bowlinger sent another letter to RSI on

---

[4] The evidence does not provide the date of the FBI raid.  Wass testified that he became aware of

August 11, 2003, stating the Racing Commission had not received payments for the general fund or the special funds since July 2, 2003.  He requested a complete set of RSI's financial records.

Wass testified that PWE stopped wagering through RSI in North Dakota at the end of July 2003.  PWE stopped because of the federal investigation and the information being reported by the media.  On July 31, 2003, PWE made a demand for the $2,248,301.11 it believed was in its account with RSI.[5]

Daniel Crothers was local counsel for PWE.  He testified that by the end of July 2003, news articles were reporting on RSI's financial difficulties.  PWE was becoming critically concerned about RSI's nonpayment of PWE.  Press reports also showed the State had monetary issues with RSI.

5.      Conversations Between PWE and the State About What to Do

From July to September 2003, Crothers had conversations with the State on PWE's behalf.  They discussed two issues:  the substantial amount of money RSI owed to PWE for past wagers and whether PWE would return to wagering in North Dakota.

---

the FBI investigation into RSI in late April or early May 2003.

[5] Wass testified that he had estimated one portion of this amount and his estimate was off, but only by a couple hundred dollars.  PWE's proof of claim states that the amount of the debt owed to PWE by RSI is $2,248,100.86.

On August 5, 2003, Crothers had a conversation with Assistant Attorney General Sandi Tabor about what the State was doing to stabilize RSI.  Crothers told Tabor that PWE would not return to wagering in North Dakota without stability.  During one of his conversations with the State, Crothers said PWE supported the appointment of a receiver for RSI.

On August 12, 2003, Wass had a similar telephone conversation with Bowlinger.  Wass told him that PWE was no longer wagering in North Dakota, that PWE might consider coming back to North Dakota if there was a more transparent service provider, and that PWE was owed a "bunch of money" including a Certificate of Deposit with Wells Fargo.  Bowlinger was cordial, and expressed concern the State was also owed a "bunch of money."  Bowlinger told him that the State had made a demand on RSI for payment by August 15, and if RSI did not comply, action might be taken against RSI's license at the August 20, 2003 Racing Commission meeting.  Bowlinger said he would let Wass know the results and Tabor would call Crothers.

Wass called Bowlinger back on August 13, 2003, to tell him the total amount RSI owed PWE was $2,248,000.00.  Bowlinger told Wass an auditor was in place at RSI.

16

On August 18, 2003, a conference call took place with representatives of PWE and the State.  The participants on the call included Attorney General Wayne Stenehjem, Assistant Attorney General Doug Bahr, Special Assistant Attorney General Roger Minch, Tabor, Bowlinger, Crothers, Wass, Martin Foley,[6] and Ed Reeser.[7]  Crothers testified that the purpose of the conference call was to make some progress on PWE's unpaid account and to determine the right avenue to protect PWE's interest.  PWE had not been paid on its account for months.  Its efforts to recover what it was owed had been fruitless.  The press continued to report that RSI was having financial difficulties.  PWE's options were to file a lawsuit to seek a writ of attachment or insist on the appointment of a receiver.

The State also laid out its position.  The State said that it had received $1.5 million that day from RSI but was still owed $5 million.  The State was also considering filing a lawsuit against RSI and its stockholders, but was more interested in stabilizing RSI through the appointment of a receiver.  The goal was to get both the State and the players, including PWE, paid the money they were owed.  The State also wanted PWE to return to wagering in North Dakota.  PWE said RSI needed to be more stable before that would happen.

---

[6] Martin Foley is also counsel for PWE.
[7] Ed Reeser was outside general counsel for PWE at the time.

17

In the end, the plan was to move forward with a receiver in place.  Crothers understood that neither the State nor PWE would take any action to interrupt RSI's business operations.  Wass thought the State would take action and the receiver would "right the ship."  He thought they were on the path to success, meaning the players would get paid without bleeding RSI to death.  He admitted he was concerned when he heard the State had just received $1.5 million from RSI, because it would mean less money available to pay PWE.  He still thought, however, RSI would be able to cover the amount PWE was owed.  He did not know RSI's financial condition, but said he had no indication that RSI could not pay.

Wass testified that PWE did not file a lawsuit against RSI because they knew it would end horse racing in North Dakota because all other bettors would "jump ship."  Rather, PWE put faith in the State to work the problem out so that PWE would get paid.  He did not think the State would come in and take everything—which is what he claims ultimately happened.

The Racing Commission prepared an audit report dated August 18, 2003.  It states that RSI's total unreported handle from the unlicensed "stealth" site from October 2002 through April 2003 was $98,975,620.00.  It showed $8,066,282.04 due to the Racing Commission for underpaid taxes and arrears.

18

6.      Appointment of a Receiver

Wass worked with the State to prepare an affidavit to attach to the

application for a receiver.  It stated, among other things, that PWE had demanded

payment in the amount of $2,248,201.11 on July 31, 2003, and RSI failed to pay.

He signed the affidavit on August 20, 2003.

On August 21, 2003, the State filed a complaint against RSI seeking a

judgment for $6,329,463.06 plus interest, an injunction preventing RSI from

dissipating any of its assets, and the appointment of a receiver or monitor.  RSI

stipulated to the appointment of a receiver on the same date.  The state court

appointed Wayne Drewes as RSI's receiver.

Drewes testified that upon his appointment, the Attorney General told him

that he was in charge and that the State wanted to see RSI's business continue.

The Attorney General did not tell Drewes how to treat the State's tax claims or the

players' claims.  Drewes' duties included determining whether RSI was a viable

business and to keep it operating as a going concern.  Drewes became familiar with

RSI's operations and practices and reviewed RSI's financial information.  He

never saw anything suggesting that the State was involved in inequitable conduct

toward RSI, its operations or its assets.  He believed the State wanted RSI to

continue operations and be successful.  In his view, the State did not have any

control over RSI.  As receiver, only he had control.

Drewes and PWE had a cooperative relationship initially.  That deteriorated

by December 2003.  PWE sent a letter to Drewes on December 4, 2003, saying that

it was not satisfied with how Drewes was treating PWE.  PWE received no

response from Drewes.  PWE filed a complaint against RSI on December 12, 2003.

PWE found out some time in December that the $225,000 certificate of

deposit PWE had pledged to help RSI get a $450,000 Letter of Credit had been

pulled and liquidated.  He learned this from a newspaper article. Wass emailed

Bowlinger on December 23, 2003, asking about it.  Bowlinger responded on

December 30, 2003.  He said the matter had been turned over to the Racing

Commission's counsel, Bill Peterson.

Wells Fargo[8] sent PWE a letter dated January 22, 2004, stating Wells Fargo

received a request to draw on the letter of credit on December 26, 2003.  Wells

Fargo attached a statement signed by Bowlinger requesting the draw because RSI

had not fulfilled its obligations under state law and the Racing Commission's rules.

Wells Fargo's letter pointed out the letter of credit had an expiration date of

---

[8] Wells Fargo was formerly known as Norwest Bank, and was Norwest Bank at the time
PWE pledged the certificate of deposit.

December 31, 2003, and it was therefore obligated to pay the request.  As a consequence, Wells Fargo cashed and disbursed the $225,000 certificate of deposit PWE provided.

Bowlinger testified that the Racing Commission decided to collect on the letter of credit on the advice of its counsel, Bill Peterson.  Peterson  is a Deputy Assistant Attorney General.  He was present at all of the Racing Commission meetings.

Wass testified PWE felt betrayed by the State.  PWE thought the State should have worked to get PWE paid.  Instead, PWE felt the State shut PWE out of communications and the relationship became adversarial.

C.     PWE's Forensic Accountant

Thomas Pastore is a forensic accountant and business appraiser.  PWE retained Pastore to render a solvency opinion on RSI and to determine the amount of money transferred from RSI to the State during the one-year period before RSI's bankruptcy filing.

As of the end of July 2003, PWE had approximately $2,023,100.86 in its deposit account with RSI.  This included winnings, deposits, and incentives belonging to PWE.  PWE had also purchased the certificate of deposit for $225,000 and pledged it to help RSI get the $450,000 letter of credit.

According to Pastore, beginning in February 2003 and onward, RSI's liquidity was negatively impacted and it was unable to meet its current obligations. From January through May 2003, RSI incurred monthly losses for earnings before interest, taxes, depreciation and amortization of ($492,067) as well as net income which averaged ($296,212). This resulted in a negative 90% return on assets for January through May 2003. Pastore also noted that from February 2003 onward, the total shareholders' deficit was more than 30% of total assets. Pastore provided a cash-flow analysis showing RSI was heading into a negative cash balance as of the end of February 2003. The negative cash-flows resulted in a negative cash balance in March 2003. This cash deficit continued to increase thereafter. Based on all these factors, Pastore stated RSI was insolvent by the end of March 2003 and remained insolvent thereafter.[9]

Pastore's accounting showed that from February 2003 through at least October 2003, the State collected in excess of $4.3 million from RSI. Additionally, in December 2003, the State drew down the $450,000 RSI letter of credit (which included the $225,000 certificate of deposit PWE provided). In April 2004, the State drew down $50,000 from another RSI letter of credit. The total

---

[9] Pastore's analysis showed that RSI was insolvent by February 2003 based on its deteriorating liquidity and total shareholders' deficit.

amount the State collected was $4,839,421.56.  This amount does not include

checks written to the State by RSI after October 16, 2003, totaling $199,593.70.

Pastore also found another $281,085.94 in checks that were not included in the

State's receipts.  In total, the State collected $5,320,101.20 in the year before RSI's

bankruptcy filing.[10]  In the 90 days before RSI's filing, the State collected

$556,244.98, consisting of the $450,000 letter of credit, four checks dated

November 24, 2003, totaling $105,544.98,[11] and a check dated December 10, 2003,

in the amount of $700.00.

D.      RSI's Bankruptcy

        The receivership ended with RSI's bankruptcy filing on February 2, 2004.

Drewes testified that although he dealt with several challenges as RSI's receiver,

he ultimately thought he had a plan for RSI going forward until RSI lost its license.

Bankruptcy then appeared to be the only alternative.

        PWE filed a proof of claim in RSI's bankruptcy for $2,248,100.86.  It was

broken down as follows:

Total for Wagering Accounts (winnings and deposits)     $1,930,658.70
Incentive for week ending 7/27/03                          91,742.41
Incentive for 7/28/03                                         699.75

---

[10] This amount included $50,000 from a letter of credit the State collected in April 2004,
after RSI's bankruptcy filing.  Deducting this amount from his total results in
$5,270.101.20.
[11] The individual checks are for $25,598.42, $9,012.51, $59,515.01, and $700.00.

| | |
|---|---|
| Certificate of Deposit | 225,000.00 |
| Total Claim | $2,248,100.86 |

The State filed a proof of claim for $6,726,872.72.  It filed an amended proof of claim in 2010 for $6,422,243.58.

## SUMMARY OF THE ARGUMENTS

PWE brings multiple theories of recovery on behalf of the estate.  First, PWE claims that RSI's payments to the State in the year leading up to bankruptcy are recoverable as preferential transfers.  PWE argues the State had enough control over RSI that its dealings cannot be considered arm's-length, and therefore, the State should be considered a non-statutory insider.  PWE claims in the alternative that, if the State is not an insider, the estate is entitled to recover any preferential transfers made within the 90 days before bankruptcy.  The State argues it was not an insider, it dealt at arm's-length, and whatever influence it exerted in getting paid was no more than that of an ordinary creditor.

PWE also seeks to avoid RSI's transfers to the State as fraudulent conveyances.  PWE asserts that RSI was insolvent when it made the transfers and that RSI received less than reasonably equivalent value.  The State admits that RSI was insolvent during the period.  However, the State argues that RSI received reasonably equivalent value because the amount RSI paid in taxes was the same amount it owed.

24

Finally, PWE argues that the State engaged in inequitable conduct and therefore the State's claims should be equitably subordinated to those of other creditors.  PWE suggests its losses might have been mitigated if the State had taken action sooner.  Instead, the State waited as long as possible hoping to receive more revenue.  PWE also argues the State had a duty to do more as a regulator to protect those bettors who had accounts with RSI.  Because the State did not fulfill its regulatory duties, it is inequitable the State should be paid before other creditors.  The State denies it engaged in inequitable conduct.  Rather, the State claims that its regulators acted reasonably and in good faith adopting a flexible approach in an attempt to save RSI.  When the situation finally became intolerable, the State consulted with PWE about putting a receiver in place.  The State argues it acted in the interests of all parties and did not engage in inequitable conduct.

## CONCLUSIONS OF LAW

A.    <u>Preferential Transfer Claims</u>

Section 547(b) provides that, subject to exceptions not applicable here, the trustee may avoid any transfer of an interest of the debtor in property—

(1)    to or for the benefit of a creditor;
(2)    for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3)    made while the debtor was insolvent;
(4)    made—

25

    (A)   on or within 90 days before the date of the filing of the petition; or

    (B)   between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5)   that enables such creditor to receive more than such creditor would receive if—

    (A)   the case were a case under chapter 7 of this title;

    (B)   the transfer had not been made; and

    (C)   such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).   The purpose behind the avoidability of preferential transfers is "'to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy.'" Lindquist v. Dorholt (In re Dorholt, Inc.), 224 F.3d 871, 873 (8th Cir. 2000) (quoting Jones Truck Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 326 (8th Cir. 1997)).   PWE, standing in the shoes of the trustee, has the burden of proving the avoidability of any transfers under section 547(b).   See 11 U.S.C. § 547(g).   PWE must establish each element by a preponderance of the evidence.   See Wells Fargo Home Mortg., Inc. v. Lindquist, 592 F.3d 838, 842 (8th Cir. 2010).

    1.    The State as an Insider

    Normally, a trustee—in this case PWE—may only avoid transfers which occurred within the 90 days preceding the bankruptcy filing.   11 U.S.C.

26

§ 547(b)(4)(A).  The reach-back period is extended, however, to one year

preceding the bankruptcy petition date if the transferee is an insider.  11 U.S.C.

§ 547(b)(4)(B).  PWE argues the State is an insider of RSI.

With respect to a corporate debtor, an "insider" includes a:

(i)     director of the debtor;
(ii)    officer of the debtor;
(iii)   person in control of the debtor;
(iv)    partnership in which the debtor is a general partner; general
        partner of the debtor; or
(vi)    relative of a general partner, director, officer, or person in
        control of the debtor.

11 U.S.C. § 101(31)(B).  The Code's use of the word "includes" is not limiting.

See 11 U.S.C. § 102(3).  In other words, the list of possible insiders is illustrative,

not exclusive.  Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.), 346 B.R.

798, 804 (B.A.P. 8th Cir. 2006).  Courts have identified a category of creditors,

sometimes called nonstatutory insiders, falling within the definition of "insider"

but outside the enumerated categories.  See generally Schubert v. Lucent

Technologies Inc. (In re Winstar Communications, Inc.), 554 F.3d 382 (3d Cir.

2009); Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.), 531 F.3d 1272

(10th Cir. 2008).  The Court must therefore look beyond the statutory categories to

determine whether the State was an insider of RSI.

The Bankruptcy Appellate Panel for the Eighth Circuit considered the question of a nonstatutory insider in In re Rosen Auto Leasing, Inc.:

> An insider is one who does not deal at arm's length with the debtor. Involvement in the day-to-day business of a debtor may elevate a creditor to insider status.  However, the creditor would have to exert control over the debtor before gaining insider status. The ability of a creditor to compel payment of a debt is insufficient control to render the creditor an insider. In ascertaining insider status, the closeness of the relationship between the parties is also relevant.

346 B.R. at 804 (citations omitted).

        a.    The State's level of control

PWE argues that the State, as regulator, controlled every aspect of RSI's business operations because it had authority to inspect, supervise and audit all of RSI's operations, and, in the case of a violation, revoke its license.

Courts, however, are reluctant to construe financial oversight—even intrusive oversight—as the control required to impose insider status.  In re Armstrong, 231 B.R. at 749.  The fact that a creditor examines, monitors, and even controls some aspects of a debtor's financial affairs does not render the creditor an insider.  Id.  (citing In re Meridith Millard Partners, 145 B.R. 682, 688 (D. Colo. 1992), aff'd, 12 F.3d 1549 (10th Cir. 1994), cert. denied, 512 U.S. 1206 (1994)). "Financial power alone does not render a creditor an insider."  Id. (citation omitted).  The court in In re Armstrong stated:

28

In determining whether a creditor, and particularly a bank, has the requisite level of control to be an insider, the courts examine whether the creditor had more ability to assert control than the other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses. There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.

In re Armstrong, 231 B.R. at 749–50 (citations omitted).

In this case, by virtue of its regulatory function, the State asserted some control over RSI.  There is no evidence, however, that the State made management decisions for RSI or directed work performance.  The State also did not direct payment of RSI's expenses.  See id. at 750 (finding that a creditor was not an insider because even though the creditor required the debtor to submit frequent reports on receivables, invoices, and operations, the creditor received all payments on the receivables and had the power to endorse checks and obtain concessions from the debtor, it had no control of the day-to-day decision making of the debtor). The State may have made payment demands on RSI, even threatening RSI's license in the event of nonpayment, but that was exerting influence regarding financial transactions in which the State had a direct stake rather than exerting day-to-day control.  See id. at 749 ("The examination of the level of control must be made with the understanding that control over financial affairs may be an

29

unavoidable circumstance attendant to many creditor-debtor relationships.").  In

short, the State did not wield the control necessary over RSI to render it an insider.

       b.     The State's arm's-length transactions with RSI

The evidence does not suggest that the State's transactions with RSI were at

less-than-arm's-length.  In <u>Anstine v. Carl Zeiss Meditec AG (In re U.S. Med.,</u>

<u>Inc.)</u>, the Tenth Circuit, quoting Black's Law Dictionary, defined an arm's length

transaction as "a transaction in good faith in the ordinary course of business by

parties with independent interests . . . . The standard under which unrelated parties,

each acting in his or her own best interest, would carry out a particular

transaction." 531 F.3d 1272, 1277 n.4 (10th Cir. 2008).

In <u>Schubert v. Lucent Tech., Inc. (In re Winstar Commc'ns, Inc.)</u>, the Third

Circuit Court of Appeals, citing <u>U.S. Medical</u>, focused on whether the alleged

insider had the ability to coerce the debtor into transactions that were not in the

debtor's best interest.  554 F.3d 382 (3d Cir. 2009).  In deeming a creditor to be a

nonstatutory insider, the court cited a series of overbearing acts by the creditor.  <u>Id.</u>

at 397–98.  These included coercing the debtor to buy goods that the debtor did not

need or that never left the creditor's warehouse, with the "sales" timed to enhance

the creditor's financial reports; treating the debtor as a captive purchaser; and

compelling the debtor to make purchases that violated a covenant in the parties'

contract and then refusing to issue a waiver that would have given the debtor relief.
Id.

No such coercion is evident in the circumstances of this case.  PWE argues

that the State should not have allowed RSI to continue its operations in light of:

RSI's arrearages on special fund payments; the State's knowledge of RSI's

financial condition and PWE's unanswered demands for payment; and the

discovery of the unlicensed gaming site.  PWE further asserts that the State's

allowance of RSI's continued operations was for its own financial benefit.  These

arguments are beside the point.

The uncontroverted testimony of several witnesses was that the State wanted

to keep RSI operating so that not only it, but also PWE, would get paid.  During

the August 18 telephonic meeting, PWE agreed to the appointment of a receiver

which both sides thought was in everyone's best interest.  After that point the

receiver was in control.  Further, and more to the point, PWE failed to provide an

evidentiary basis to establish that the transactions at issue—RSI's payments to the

State in the one-year prior to RSI's bankruptcy—were not accomplished at arm's

length.  The State had the right to the payments and acted in good faith and well

within the parameters of its regulatory authority.  None of the members of the

Racing Commission appeared at trial to offer testimony inconsistent with the

31

foregoing conclusions.  Because PWE did not show that the State had the requisite

degree of control over RSI or that it engaged in less-than-arm's-length transactions

with RSI, as a matter of law, the State was not a nonstatutory insider of RSI under

section 547(b)(4)(B).

     2.      General Preference Claim

The fact that the State is not an insider means that the time period at issue

for preferential transfers is 90 days, rather than one year, before the date of RSI's

bankruptcy filing.  See 11 U.S.C. § 547(b)(4)(A) and (B).

In the 90 days before RSI's filing, RSI transferred a total of $556,244.98 to

the State.  This amount includes: (1) four checks totaling $105,544.98 dated

November 24, 2003; (2) a check for $700.00 dated December 10, 2003; and (3) the

$450,000 draw down on the letter of credit on December 23, 2003.  In PWE's

Reply to Defendant's Post-Trial Brief, PWE conceded that the draw down on the

letter of credit is not recoverable as a preferential transfer.  Therefore, we need

focus only on the remaining five checks.

A debtor's payment to a creditor with a priority claim does not constitute a

preference if the creditor would have received the same distribution in a Chapter 7

liquidation.  Rocin Liquidation Estate v. Alta AH & L (In re Rocor Intern., Inc.),

352 B.R. 319, 330 (Bankr. W.D. Okla. 2006); 11 U.S.C. § 547(b)(5).  The State

argues PWE has failed to show the transfers enabled the State to receive more than

it would have received in a liquidation.  The State filed a proof of claim asserting a

priority tax claim under section 507(a)(8) in the amount of $6,726,872.72.  PWE

failed to prove the State would not be entitled to payment of at least $106,244.98,

the amount of the contested transfers within 90 days of RSI's bankruptcy filing, by

virtue of its priority status.[12]  Accordingly, PWE's preferential transfer claim fails.

B.   <u>Fraudulent Transfer Claims</u>

PWE also seeks to avoid the transfers of RSI's assets to the State under 11

U.S.C. § 544(b)(1) which provides that the trustee may avoid any transfers

avoidable under applicable law.  Specifically, PWE seeks to avoid the transfers

---

[12] In its opening post-trial brief, PWE's entire discussion of this element is as follows:
> The only possibility creditors have for a meaningful recovery in this case is
> if PWE is successful in recovering funds from the State.  If successful, the
> State's claims will be subordinated to all other creditors.  Accordingly, the
> State benefitted from the preferential transfers by the lesser of (1) the
> aggregate amount owed to all creditors, or (2) the total amount of the
> transfers.

(Plaintiff's Post-Trial Brief, ECF Doc. No. 143, p. 38.)  This completely misses the mark.
In its reply to the State's post-trial brief, PWE revisits the issue and argues that the State
is not entitled to a priority claim.  It asks the Court to enlarge the pleadings, *sua sponte*,
to include a cause of action seeking a recharacterization of the State's claim.  The Court
declines this invitation.  In the alternative, it moves the Court to amend its complaint
pursuant to Federal Rule of Civil Procedure 15(b)(2) to include the cause of action to
recharacterize the State's claim.  PWE's second claim for relief in its complaint sought a
determination that the State's claim was not entitled to priority status because the taxes
owed by RSI to the State were not taxes, but rather were fees or assessments.  In its
motion for summary judgment, PWE abandoned this claim and conceded that the
amounts collected and claimed by the State constitute taxes.  The motion is denied.

under North Dakota law.  It also seeks to avoid the transfers under section

548(a)(1)(B) of the Bankruptcy Code.

     This Court has previously addressed the similarity in the analysis of claims

under sections 544 and 548:

> [Section 544(b)(1)] expressly authorizes a trustee to avoid a transfer
> voidable under North Dakota's version of the Uniform Fraudulent
> Transfer Act ("UFTA"), codified at N.D.C.C. ch. 13–02.1. The policy
> underlying both the UFTA and section 544 is to preserve assets of the
> estate for the benefit of creditors. The Bankruptcy Code also contains
> a provision allowing a bankruptcy trustee to set aside fraudulent
> transfers, found in section 548. The language of UFTA and section
> 548 are nearly identical; the only significant difference is a longer
> statute of limitations under North Dakota law.  Considering the
> similarities in purpose and language, many courts have concluded that
> the UFTA and section 548 are in pari materia, and that the same
> analysis applies under both laws.  The Court finds the reasoning
> behind these cases persuasive and will analyze the transfer at issue
> only under the purview of section 548.

Kaler v. Red River Commodities, Inc. (In re Sun Valley Products, Inc.), 328 B.R.

147, 155–56 (Bankr. D.N.D. 2005) (citations and footnote omitted).  Likewise, this

Court will analyze the transfers at issue only under section 548.

     Under section 548(a)(1)(B), a transfer that was made within one year[13] of the

bankruptcy petition is constructively fraudulent if a debtor was insolvent on the

---

[13] The reach-back period under section 548 was extended from one year to two years as
the result of the passage of the Bankruptcy Abuse Prevention and Consumer Protection
Act of 2005 (BAPCPA).  The one-year reach-back period applies in this case because the
main bankruptcy case was filed in 2004.  The applicable reach-back period under North
Dakota law is four years.  N.D.C.C. § 13-02.1-09.

date the transfer was made and received less than a reasonably equivalent value in exchange for the transfer.  11 U.S.C. § 548(a)(1)(B)(I) and (ii)(I).  The parties do not dispute that the transfers at issue were within the statutes of limitations or that RSI was insolvent when the transfers were made.  Rather, the dispute in this case focuses on whether RSI received reasonably equivalent value for the transfers to the State.

In determining whether the payments a debtor received were in exchange for reasonably equivalent value, courts consider whether: (1) value was given; (2) it was given in exchange for the transfer; and (3) what was transferred was reasonably equivalent to what was received.  Meeks v. Don Howard Charitable Remainder Trust (In re S. Health Care of Ark., Inc.), 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004); In re Sun Valley Prods., Inc., 328 B.R. at 156.  "Value" is defined in section 548(d)(2)(A) as "property, or satisfaction or securing of a present or antecedent debt of the debtor[.]" 11 U.S.C. § 548(d)(2)(A).

PWE argues that RSI did not receive reasonably equivalent value for the taxes it paid because RSI did not owe the taxes; in other words, the transfers were not in satisfaction of a debt of RSI.  PWE reminds the Court of the finding in the Memorandum and Order in this case, dated December 22, 2010: "PWE is correct that after the interim emergency rule lapsed, the responsibility to pay the taxes and

35

fees shifted back to the simulcast operator." <u>In re Racing Services, Inc.</u>, 2010 WL 5376222, at *8 (Bankr. D.N.D. December 22, 2010).

The State responds that PWE's claims are barred by the voluntary payment doctrine, which provides:

> Generally, in the absence of a statute to the contrary, a person who has paid a license fee or tax which is illegal or in excess of the sum which might lawfully be exacted cannot recover the amount paid if the payment was made voluntarily with full knowledge of the facts, although it was made in good faith, through a mistake or in ignorance of the law, unless the recovery is permitted by an agreement entered into at the time the payment was made.

<u>First Bank of Buffalo v. Conrad,</u> 350 N.W.2d 580, 586 (N.D. 1984).

The State cites <u>Wolff v. United States</u>, 372 B.R. 244 (D. Md. 2007), for support.  The court in <u>Wolff</u> found the voluntary payment doctrine applicable under the Maryland Uniform Fraudulent Conveyance Act (MUFCA).  Under MUFCA, a conveyance is defined as "every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or encumbrance."  Md. Code Ann., Com. Law, § 15-201(c).

In contrast to the Maryland statute, both the state and federal fraudulent transfer statues at issue in this case specifically permit recovery of voluntary payments.  <u>See</u> 11 U.S.C. § 548(a)(1) ("if the debtor voluntarily or involuntarily –

36

(A) made such transfer . . . or (B) received less than a reasonably equivalent

value); N.D.C.C § 13-02.1-01(12) ("'Transfer' means every mode . . . voluntary or

involuntary").  Accordingly, they are statutes to the contrary of the voluntary

payment doctrine, and the doctrine does not apply to bar recovery in this case.  See

First Bank of Buffalo, 350 N.W.2d at 586.

Notwithstanding the inapplicability of the voluntary payment doctrine and

the fact that the responsibility to pay the taxes shifted back to Team Makers when

the interim rule lapsed, RSI nonetheless received value for the transfers.

Although transfers made *solely* for the benefit of a third party do not furnish

reasonably equivalent value, a transfer on behalf of a third party may produce a

benefit that ultimately flows to the debtor, albeit indirectly.  Pummill v.

Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.), 267 B.R.

602, 613–14 (B.A.P. 8th Cir. 2001).  As the BAP recognized:

> [T]he rule that a debtor who pays the debt of another normally does
> not receive value is subject to "a rather large qualification . . . . *Even
> though the debtor makes a transfer, or incurs an obligation for
> consideration that moves (in form or substance) **directly** to a third
> person, the debtor nevertheless receives value if she receives an
> economic benefit indirectly (in form or substance).*  The consideration
> need not flow directly to her to satisfy the value component of
> reasonably equivalent value.  Value requires only that the transfer
> result, whether directly or indirectly, in economic benefit running
> directly to someone else where: . . . 2) the debtor and the other person
> share an identity of economic interests so that the debtor got some or
> all of the direct benefit straightforwardly even though, in form, it

passed only to the other person because what benefits one will benefit the other.

In re Richards & Conover Steel, Co., 267 B.R. at 614 (citation omitted).

In this case, the payments to the State resulted in an economic benefit to RSI. They allowed RSI to continue operating. The fact that the Racing Commission considered adverse action against RSI's license due to its nonpayment of the taxes evidences that RSI's payment of the taxes was an essential term and condition of its simulcast service provider license in addition to being the long-standing practice. RSI's annual license renewal applications represented to the Racing Commission that it would be responsible for payment of the parimutuel wagering taxes to the State. Team Makers' applications similarly indicated that RSI would pay the necessary distributions. Team Makers received the benefit of the tax payments insofar as Team Makers had the responsibility for the payments, but what benefitted Team Makers also benefitted RSI. The tax payments had value and they were given in exchange for that value.

The remaining question is whether the transfers were reasonably equivalent to what was received. See In re S. Health Care of Ark., Inc., 309 B.R. at 319. According to Pastore's accounting, RSI transferred $5,270,101.20 to the State in the one year prior to bankruptcy. North Dakota law determined the amount of the tax payments that were taken from the wagering pool. See N.D.C.C. § 53-06.2-11.

38

RSI collected the taxes from the wagers and paid them to the State as it was required to do to maintain its license and continue operating. The payments reduced the tax liability dollar for dollar and therefore constituted reasonably equivalent value.

C.     Equitable Subordination

Section 510(c) of the Bankruptcy Code authorizes the subordination of an allowed claim under principles of equity. 11 U.S.C. § 510(c)(1). The purpose of equitable subordination is to "undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." Bunch v. J.M. Capital Fin., Ltd. (In re Hoffinger Indus., Inc.), 327 B.R. 389, 415 (Bankr. E.D. Ark. 2005) (quoting Bostian v. Schapiro (In re Kansas City Journal-Post Co.), 144 F.2d 791, 800 (8th Cir. 1944)).

"Equitable subordination requires proof of inequitable conduct by the claimant that injured other creditors or conferred an unfair advantage." Kaler v. Bala (In re Racing Services, Inc.), 571 B.R. 729, 731 (8th Cir. 2009). Examples of such inequitable conduct includes fraud, illegality, and breach of fiduciary duty. Id. Although the doctrine of equitable subordination may be applied to ordinary creditors as well as insiders, cases that subordinate the claims of creditors that dealt at arm's length with a debtor are few and far between. See generally Carter-

39

Waters Okla., Inc. v. Bank One Trust Co., N.A. (In re Eufaula Indus. Auth.), 266

B.R. 483 (B.A.P. 10th Cir. 2001); Official Comm. of Unsecured Creditors of

Lois/USA, Inc. v. Conseco Fin. Serv. Corp. (In re Lois/USA, Inc.), 264 B.R. 69

(Bankr. S.D.N.Y. 2001).

PWE argues that the State engaged in inequitable conduct. Specifically, it

argues that the State: (1) failed to protect RSI's creditors' interests and the integrity

of North Dakota's racing industry by failing to properly regulate RSI; (2) permitted

RSI to fall deeper into insolvency despite knowledge of RSI's financial difficulties;

and (3) permitted RSI to retain its license despite the State's knowledge that RSI

was conducting an illegal gambling operation. PWE further argues that the State

engaged in inequitable conduct by: (1) "failing to properly regulate to protect

PWE's account with RSI such that the money in the account was not there at the

time of RSI's bankruptcy filing"; (2) "failing to investigate RSI's financial

situation despite its failure to timely pay taxes . . . since September 2001"; (3)

"failing to investigate and take action despite their suspicion that RSI was engaged

in illegal activity as of January 2003"; (4) "permitting RSI to continue to do

business even after it was shown to have a multi-million dollar tax liability and it

was under investigation for illegal gaming operations"; (5) "failing to appoint a

receiver until almost the end of August 2003 despite suspicions of illegal gambling

[much earlier] . . . ." (Plaintiff's Post-Trial Brief, ECF Doc. No. 143, p. 50–51.)

PWE's assertions rely unduly on the benefit of hindsight. The State

authorities clearly hoped to save RSI and did everything they could to help RSI

recover from its financial difficulties—difficulties which started after 9/11. The

State authorities were willing to work with RSI and be flexible on the payment

schedule for the taxes. The record suggests RSI had been a viable operating

business for a number of years before its financial problems began, and PWE does

not suggest any reason why it would have been impossible for RSI to recover by

continuing to operate. PWE is correct that the State authorities were aware of

significant problems at RSI by early 2003. However, the State regulators were not

under any obligation to take any specific action. They had discretion with how to

proceed. In the end, the State authorities made the decision to try to save the

existing operator who had successfully run the business; they chose to move

forward with RSI. When the situation became intolerable, the State sought the

appointment of a receiver. Although PWE argues the State should have stepped in

and sought the appointment of a receiver sooner, this assertion relys unduly on the

benefit of hindsight. This Court will not second guess the decisions of the State

regulators. The State exercised its authority, as defined by North Dakota law and

administrative procedures, with discretion and a utilitarian goal given the
information it had at the time. The State did not engage in inequitable conduct
such that its claim should be equitably subordinated.

Finally, PWE makes two arguments in the alternative. First, PWE argues
that the State engaged in illegal conduct by demanding that RSI pay the taxes and
by coercing payment by threatening revocation of RSI's license—in violation of its
own statutes and regulations. Second PWE argues that "the State . . . engaged in
inequitable conduct when the State, as an insider (for equitable subordination
purposes) convinced PWE not to pursue a writ of attachment against RSI but
instead to rely on the receiver process being pursued by the State, while not
informing PWE that the State was simultaneously collecting over $1.7 million
from the insolvent RSI." (Plaintiff's Post-Trial Brief, ECF Doc. No. 143, p. 54.)
Taking the latter first, the second argument fails because, as found above, the State
was not an insider of RSI. The first argument also fails in that the State did not
engage in illegal conduct.

All parties understood that RSI was going to be responsible for paying the
State taxes. This Court previously held "RSI's continued practice of handling this
responsibility on behalf of the simulcast operator was not in contravention of the
law." In re Racing Servs., Inc., 2010 WL 5376222, at *8 (Bankr. D.N.D.

42

December 22, 2010).  Whether by agreement with the State or agreement with Team Makers or both, all parties understood that RSI was responsible for making the payments to the State.  If the State taxes were not paid, the licenses of both parties, not just RSI, were on the line.  As RSI was the party who had agreed to pay the State, and RSI was the party who had the State's funds, the State naturally demanded payment of RSI.  While the State statutes did not expressly authorize the State to tax RSI, neither did they prohibit it from collecting from RSI.  Thus, there was nothing inequitable about the State's conduct such that its claims should be subject to equitable subordination.

For the foregoing reasons, PWE's Complaint is DISMISSED.

The Court has considered all other arguments and deems them to be without merit.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this October 19, 2012.

**THAD J. COLLINS, JUDGE**
**UNITED STATES BANKRUPTCY COURT**